**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------X

MARIO FRATI, STACY FRATI and
BANCO POPOLARE (LUXEMBOURG) S.A.,

                         Plaintiffs,

          -against-

STEPHEN E. SALTZSTEIN,
MICHAEL E. FEIN,
RAM CAPITAL RESOURCES, LLC,
SHELTER ISLAND OPPORTUNITY FUND, LLC,
SHELTER ISLAND GP, LLC,
MIDWAY MANAGEMENT PARTNERS, LLC,
TRUK INTERNATIONAL FUND, LP,
TRUK OPPORTUNITY FUND, LLC,
ATOLL ASSET MANAGEMENT, LLC,

                       Defendants,
--------------------------------------------------------------X

*10* Civ. **3255** *(PAC)*

**COMPLAINT**

**JURY TRIAL REQUESTED**

       Plaintiffs Mario Frati, Stacy Frati and Banco Popolare (Luxembourg) S.A., on behalf of

its client, Mrs. Mirella Siroli, an Italian citizen ("BPL") (all plaintiffs are collectively referred to

herein as the "Plaintiffs"), by and through their attorneys, The Roth Law Firm, PLLC, hereby

submit this Complaint against Defendants Stephen E. Saltzstein ("Saltzstein"), Michael E. Fein

("Fein"), RAM Capital Resources, LLC ("RAM"), Shelter Island Opportunity Fund, LLC

("Shelter Fund"), Shelter Island GP, LLC ("Shelter GP"), Midway Management Partners, LLC

("Midway"), Truk International Fund, LP ("Truk Fund"), Truk Opportunity Fund, LLC ("Truk

Opp Fund") and Atoll Asset Management, LLC ("Atoll") (all defendants are collectively referred

to herein as "Defendants") and state as follows:

## PRELIMINARY STATEMENT

Stephen Saltzstein, the brother of Stacy Frati's childhood friend (who is now a prominent attorney at a large law firm), solicited Mario and Stacy Frati to invest in a fund he was managing. The Frati's -- who have always been conservative in their investments -- specifically asked Saltzstein whether his sister was invested in the fund. In no uncertain terms, Saltzstein indicated that his sister was, in fact, an investor. Saltzstein also indicated that he, along with the other manager (Michael Fein), had personally invested much of their own net worth in the fund. To Mario and Stacy Frati, the fact that Stephen Saltzstein and his sister were both personally invested was critical to the credibility of the investment.

As a result of Saltzstein's affirmative statements -- and the fact that the Frati's believed that Saltzstein and Fein were in full compliance with SEC rules and regulations -- the Frati's invested $2 Million in the Shelter Fund. Later the same year, based on the same representations, BPL invested $1.5 Million in the Truk Fund.

The Frati's would later find out that nothing Saltzstein and Fein represented to them was true. In fact, it appears that Saltzstein and Fein have been operating their businesses illegally since 2001 -- and in the process, defrauding investors along the way.

By Order of the SEC, dated June 19, 2009, RAM, Saltzstein and Fein were fined over a half million dollars each and suspended for their involvement in PIPE transactions from 2001 through 2005 for knowingly failing to be registered with the SEC (as required under SEC rules). The June 19, 2009 Order is annexed hereto as Exhibit A.

Upon information and belief, what the SEC apparently does not know, is that RAM, Saltzstein and Fein's wrongful activities continued after 2005 and indeed, continue to this very day. As detailed below, through a web of deceit, the use of alter-ego entities (all owned and/or

controlled by Saltzstein and Fein), shady accounting, self-serving "inter-company" loans and sham business transactions, the Defendants milked Plaintiffs' investments and now refuse to account for Plaintiffs' monies. Indeed, it appears that neither RAM, Saltzstein nor Fein have complied with the cease and desist provisions of the SEC Order.

To be sure, had Plaintiffs been made aware that Saltzstein and Fein were operating as unlicensed brokers through an unlicensed broker-dealer (RAM) -- in violation of SEC rules -- and had wholly misrepresented every material fact regarding who was invested in the Funds (including Saltzstein's sister), Plaintiffs would **never** have entrusted them with their monies in the first place or executed any relevant documents. As discussed below in detail -- based on documents obtained and Saltzstein's and Fein's unwillingness to produce a plethora of other documents and information -- it is Plaintiffs' belief that Saltzstein and Fein have engaged in a massive fraudulent scheme to which they must be held accountable. Based on the facts alleged herein, Plaintiffs allege causes of action for: (i) common law fraud; (ii) securities fraud under Section 10b of the Securities Exchange Act of 1934; (iii) fraudulent misrepresentation; (iv) violations of RICO under 18 U.S.C. 1962 (b)(c) and (d); (v) breach of fiduciary duty; (vi) rescission; (vii) unjust enrichment; (viii) accounting; and (ix) pierce the corporate veil.

Finally, Saltzstein has previously indicated to Mario and Stacy Frati that he intends on using investor monies to defend this lawsuit by way of a purported indemnification clause. Defendants are thus hereby put on notice that no such monies should be used to defend against this action sounding in fraud (or to satisfy any Judgment herein) -- and respectfully ask this Court for a declaratory judgment to that effect.

## PARTIES

1.    Plaintiffs Mario and Stacy Frati are married individuals residing in the State of Florida.

2.    Plaintiff Banco Popolare Luxembourg, SA is a business entity with it headquarters in Luxembourg. BPL made the relevant investment on behalf of its client, Mrs. Mirella Siroli, an Italian citizen.

3.    Upon information and belief, Defendant Stephen E. Saltzstein is a resident of Port Washington, New York, is not associated with a registered broker-dealer, is not a registered broker, and owns and/or controls each of the following defendant entities: RAM Capital Resources, LLC, Shelter Island Opportunity Fund, LLC, Shelter Island GP, LLC, Midway Management Partners, LLC, Truk International Fund, LC and Atoll Asset Management, LLC.

4.    Upon information and belief, Defendant Michael E. Fein is a resident of New York, New York, is not associated with a registered broker-dealer, is not a registered broker, and owns and/or controls each of the following defendant entities: RAM Capital Resources, LLC, Shelter Island Opportunity Fund, LLC, Shelter Island GP, LLC, Midway Management Partners, LLC, Truk International Fund, LC and Atoll Asset Management, LLC.

5.    Upon information and belief, Defendant RAM Capital Resources, LLC is a New York limited liability company, is not a registered broker or dealer, is owned and/or controlled by Saltzstein and Fein, and maintains a principal place of business at One East 52nd Street, 6th Floor, New York, New York 10022.

6.    Upon information and belief, Shelter Island Opportunity Fund, LLC is a Delaware limited liability company, is not a registered broker or dealer, is controlled by Saltzstein and

Fein, and maintains a principal place of business at One East 52nd Street, 6th Floor, New York, New York 10022.

7.     Upon information and belief, Shelter Island GP, LLC is a Delaware limited liability company, is not a registered broker or dealer, is owned and/or controlled by Saltzstein and Fein, and maintains a principal place of business at One East 52nd Street, 6th Floor, New York, New York 10022.

8.     Upon information and belief, Midway Management Partners, LLC is a Delaware limited liability company, is not a registered broker or dealer, is owned and/or controlled by Saltzstein and Fein, and maintains a principal place of business at One East 52nd Street, 6th Floor, New York, New York 10022.

9.     Upon information and belief, Truk International Fund, LP is a Cayman Islands limited partnership, is not a registered broker or dealer, is owned and/or controlled by Saltzstein and Fein, and maintains a principal place of business at One East 52nd Street, 6th Floor, New York, New York 10022.

10.     Upon information and belief, Truk Opportunity Fund, LLC is a Delaware limited liability company, is not a registered broker or dealer, is owned and/or controlled by Saltzstein and Fein, and maintains a principal place of business at One East 52nd Street, 6th Floor, New York, New York 10022.

11.     Upon information and belief, Atoll Asset Management, LLC is a Delaware limited liability company, is not a registered broker or dealer, is owned and/or controlled by Saltzstein and Fein, and maintains a principal place of business at One East 52nd Street, 6th Floor, New York, New York 10022.

## JURISDICTION AND VENUE

12.    This action arises under the Racketeer Influenced and Corrupt Organizations Act of 1970, 18 U.S.C.A. §§ 1961 et seq. and independently under Section 10(b) of the Securities Exchange Act of 1934.  Plaintiffs seek to recover three-fold the damages Plaintiffs sustained as a result of the Defendants' conduct, the costs of this suit, interest, and reasonable attorneys' fees. In addition, there is diversity of citizenship and this dispute exceeds the amount in controversy. The court's jurisdiction is invoked under 28 U.S.C.A. §§ 1331, 1332, 1337 and 1367; 18 U.S.C.A. §§ 1964(a) and 1964(c) .

13.    Venue is proper in this district as all Defendants do business in New York, New York and maintain a business office in New York, New York.

## FACTUAL BACKGROUND

### The Fraudulent Scheme Commences In or About 2001

14.    Upon information and belief, beginning in 2001, RAM -- through its principals, Saltzstein and Fein -- engaged in the business of identifying investors for PIPE offerings.  In connection with certain PIPE offerings, RAM also played a significant role in structuring and negotiating the terms of the PIPE offerings.  The investors compensated RAM by paying to it a certain percentage of the gross amount invested and, in most instances, allocated to RAM a certain percentage of any warrants they received as part of their investment.  As co-principals of RAM, Saltzstein's and Fein's compensation was directly derived from the fees RAM earned for services it provided to investors.  See, Exhibit A.

15.    Upon information and belief, although Saltzstein and Fein knew or should have known that RAM was required to register with the SEC as a securities broker or dealer, at no point in time did RAM register while engaging in the conduct alleged therein.  In fact, others in

the industry questioned Fein about whether RAM should be registered based on the services RAM was providing and how it was compensated for such services. Id.

16.     Further, as principals of RAM, Saltzstein and Fein played a role in providing services to PIPE investors.  Specifically, through their relationships and communications with both PIPE issuers and investors, Saltzstein and Fein had involvement in structuring certain PIPE offerings and negotiating the terms of the offerings.  In addition, they were actively involved in soliciting investors to invest in PIPE offerings.  Their compensation was paid from the fees that RAM received for the services it provided to PIPE investors. Id.

17.     By engaging in this course of conduct, RAM, Saltzstein and Fein willfully violated the broker-dealer registration provisions of Section 15(a) of the Exchange Act. Id.

18.     As a result thereof (and for conduct the SEC, upon information and belief, believed stopped in 2005), by Order of the SEC dated June 19, 2009 (Release No. 60149): (i) RAM, Fein and Saltzstein were ordered to cease and desist from committing or causing any violations and any future violations of Section 15(a) of the Exchange Act; (ii) RAM was censured; (iii) Fein was suspended from association with any broker or dealer for a period of twelve months and ordered to pay disgorgement of $364,721, prejudgment interest of $83,657 and a civil penalty of $90,000 to the United States Treasury; and (iv) Saltzstein was suspended from association with any broker or dealer for a period of six months and ordered to pay disgorgement of $364,721, prejudgment interest of $83,657 and a civil penalty of $60,000 to the United States Treasury. See, Exhibit A, pgs.5-6.

19.     Although RAM, Saltzstein's and Fein's conduct from 2001 through 2005 was not subject to an SEC order until June 2009, Plaintiffs never knew about the wrongful conduct stated therein.

20.    Upon information and belief, Saltzstein's and Fein's wrongful conduct continued past 2005, as stated below.

## RAM Acted as an Unregistered Broker-Dealer with
## Respect to the Shelter and Truk Funds

21.    Upon information and belief, Saltzstein and Fein started the Shelter Fund in June 2006.

22.    Upon information and belief, since at least June 2006, RAM -- through its principals, Saltzstein and Fein -- engaged in the business of identifying investors to invest in funds managed by them, including, the Shelter Fund and Truk Fund (which then invested in, but not limited to, PIPE offerings).  Upon information and belief, RAM received fees and commissions, either directly or indirectly, from the monies brought into the funds though its activities and also engaged in the structuring of the funds and investments made therein, and negotiated the terms of such offerings with investors and issuers.

23.    Although Saltzstein and Fein knew or should have known that RAM was required to register with the SEC as a securities broker or dealer, at no point in time did RAM register while engaging in the conduct alleged herein.

## Saltzstein and Fein Acted as Unregistered Brokers with Respect to the
## Shelter and Truk Funds

24.    Upon information and belief, at all relevant times, as co-principals of RAM, Saltzstein's and Fein's compensation by way of fees and commissions was directly derived from the fees RAM earned for services it provided to investors.

25.    Upon information and belief, at some point during the relevant time period, Saltzstein and Fein knew or were reckless in not knowing that RAM's compensation structure for its services required RAM to register as a broker-dealer.

**Through Deception and the Concealment of Material Facts,**
**Saltzstein and Fein Induce Mario and Stacy Frati to Invest $2 Million**
**In the Shelter Fund**

26.     Stacy Frati has known Saltzstein almost her entire life. Saltzstein is the younger brother of Stacy Frati's childhood best friend (who is now a prominent attorney at a large law firm).

27.     With that background, Saltzstein (in the State of New York) made an unsolicited telephone call to Mario Frati (in the State of Florida) in late 2006 in an attempt to secure a large monetary investment in a fund Saltzstein and Fein were managing. Shortly thereafter, Saltzstein and Fein traveled to Florida to meet with Mario and Stacy Frati. Despite speaking directly about the fund, and the fact that Saltzstein and Fein were managers thereof, they intentionally failed to state that they were not registered with the SEC. They also failed to disclose anything regarding the SEC investigation into their related conduct. Mario and Stacy Frati indicated they were very conservative in their investments, had never invested in a private placement such as the ones described by Saltzstein and Fein, and concluded by stating they would reserve their decision for another day.

28.     During 2007, Mario and Stacy Frati continued to receive inter-state telephone solicitations from Saltzstein, boasting of the success of his funds. In late 2007 or early 2008, Saltzstein requested once again that he travel from and to Florida for another meeting. At the meeting, Mario Frati asked Saltzstein in no uncertain terms, "is your sister [meaning Stacy Frati's close childhood friend] invested in your fund?" Saltzstein looked Mario Frati in the eye and said, "yes she is." As a further assurance to Mario and Stacy Frati, Saltzstein affirmatively stated that he and Fein had invested most of their own net worth in the fund. This was reiterated on several occasions, including in a letter from RAM dated December 16, 2008 (annexed hereto

as Exhibit J). Once again, however, Saltzstein failed to inform Mario and Stacey Frati that he and Fein were unregistered with the SEC (in violation of SEC rules) and that an investigation was ongoing relating to such unregistered status.

29.    Based on Saltzstein's and Fein's material statements and omissions, Mario and Stacy Frati agreed to invest $2 million dollars in the Shelter Fund.

30.    By email dated January 3, 2008 (see, Exhibit B), Saltzstein -- as "Director" of RAM -- gave Mario Frati wire instructions for the investment in the Shelter Fund.

31.    By email dated January 3, 2008 (see, Exhibit C), Mario Frati responded to Saltzstein's email, confirming the $2 million investment and their agreement that: (i) the management fee would be 1.750%; (ii) the incentive fee would be 17%; and (iii) there would only be a six month lockup on the investment.

32.    Importantly, Mario and Stacy Frati -- knowing nothing about private placements such as the Shelter Fund -- signed the subscription documents and wired $2 Million without ever having been given or offered the private placement memorandum.

33.    All the while, Mario and Stacy Frati have no idea that Saltzstein and Fein are acting as unlicensed brokers and that Saltzstein and Fein's company, RAM, is acting as an unlicensed broker-dealer.

**Saltzstein and Fein Induce Banco Popolare
(on behalf of its client, Mrs. Mirella Siroli) to Invest $1.5 Million**

34.    Based on the representations of fact made by Saltzstein and Fein to Mario and Stacy Frati (as stated above), Banco Popolare (on behalf of its client, Mrs. Mirella Siroli) invested $1.5 million in the Truk Fund, a fund that upon information and belief, invested exclusively in PIPE transactions.

35.    As with the Shelter Fund, the subscription documents were executed, and the investment funds delivered, without ever receiving any underlying private placement memorandum.

**Shelter Fund and Truk Fund are Set up so as to Avoid Any Accountability and Collect Excessive Fees**

36.    Upon information and belief, the Shelter Fund was set up by Saltzstein and Fein in or about June 2006. Its "Managing Member" is Shelter GP, whose principals are Saltzstein and Fein. The Shelter Fund's "Investment Manager" is Midway, whose principals are Saltzstein and Fein. All correspondence related to the Shelter Fund (specifically, by and between Saltzstein or Fein and Plaintiffs) was operated through RAM, whose principals are Saltzstein and Fein, and upon information and belief, at all relevant times acted as an unregistered broker-dealer. Indeed, the Shelter Fund, Shelter GP, Midway and RAM all share the same business address at One East 52nd Street, 6th Floor, New York, New York 10022.

37.    Not only did this particular structure of the various entities help Saltzstein and Fein avoid having to be accountable to anyone, upon information and belief, the structure was intentionally set up so as to enable Saltzstein and Fein to take fees (and other monies) from the fund in their sole discretion and without any accountability. That is, upon information and belief: (i) Shelter GP took fees as the Managing Member; (ii) Midway took fees as the Investment Manager; (iii) RAM took fees as the unregistered broker-dealer; and (iv) Saltzstein and Fein directed other fees (in the form of cash, warrants, advisory fees, monitoring fees and commitment fees) to be paid to themselves and/or other persons or entities of which they were also self-interested.

38.    Upon information and belief, Saltzstein and Fein set up the same secretive structure as to the lack of accountability and multiple/excessive fees with regard to the Truk

Fund. That is, Saltzstein and Fein acted as managers of the Truk Fund and are the principals of Atoll Asset Management (Truk Fund's "Investment Manager"), which also maintains a business address at One East 52nd Street, 6th Floor, New York, New York 10022. Upon information and belief, RAM also acted as an unregistered broker-dealer in relation to the Truk Fund's investment activities.

**Financial Statements Reveal Self-Serving Transactions and Multiple and Excessive Fees**

39.    As stated above, Saltzstein and Fein cloaked their companies and the investments made therein in secrecy. The financial statements they did provide to the Plaintiffs (after the investment was already made) specifically stated that the auditor, Eisner LLC ("Eisner") relied on Saltzstein's and Fein's determination of the value of the investments (since there was no readily ascertainable value for such investments), and in fact, the financial statements provided raised more questions than answer.

40.    The Shelter Fund financial statement for year 2007 with cover letter from Eisner (dated August 11, 2008) is annexed hereto as Exhibit D. To the Fratis' incredulity, the statement shows that the Managing Members' equity as of January 2, 2007 was $19,146. Then, during 2007, Saltzstein and Fein apparently "reallocated" to themselves $1,091,161 and immediately withdrew it, thus leaving the Managing Members' equity at $6,532 as of December 31, 2007. Accordingly, contrary to their representations to the Fratis, Saltzstein and Fein did not have most of their own net worth invested in the fund. In addition, the financial statements reveal that Saltzstein and Fein took a fee for themselves constituting over fifty percent (50%) of the Shelter Fund's net realized income for 2007. Notably, the in excess of $1 million payment to the Managing Members is exclusive of the "Management fees" of $432,417 and "Professional fees" of $245,733 that Saltzstein and Fein also took. See, Exhibit D, pgs. 3-4.

41.    Further, the 2007 financial statement reveal that the Shelter Fund loaned to its unidentified "affiliates" $16,239,777. Id. at pg. 5. Upon demand, Saltzstein and Fein have refused to identify the details of these "affiliate" loans. However, upon information and belief, the "affiliates" may have included the Truk Fund and Truk Opp Fund.

42.    Mario and Stacy Frati repeatedly requested documents and information regarding the Shelter Fund, including but not limited, financial and investment information, information regarding the "affiliates" who were receiving these multi-million dollar loans, and the identities of the members who had received redemptions (since it was suspected by the Fratis that Saltzstein and Fein were giving redemptions to either themselves or their friends or family). Saltzstein and Fein refused to be forthcoming – at one time even claiming their fax machine was not working. When they would supply financial data, it would be ambiguous at best. As yet another example, in mid-2009, the Fratis finally received a "draft" of the Shelter Fund financial statements for the year 2008 (annexed hereto as Exhibit E). According to this document (labeled "Draft Subject to Review and Revision"), in a year where the Shelter Fund suffered a net loss of $1,702,363, Saltzstein and Fein reallocated to themselves $70,390 in addition to a "Management Fee" of $693,757, "Professional Fees" of $405,454 and "Stock borrowing fees" of $67,203. See, Exhibit E, pgs. 3-4. This draft also reveals that Saltzstein and Fein had Shelter Fund loan $22,779,633 to its "affiliates" -- which were again, unidentified. Id., pg. 5.

43.    Upon information and belief, in addition to taking multiple fees cloaked under the guise of separate entities (all controlled and/or owned by Saltzstein and Fein), Saltzstein and Fein knowingly took "incentive fees" based on artificially inflated unrealized earnings.

44.    Upon information and belief, Saltzstein and Fein (fraudulently) paid themselves exorbitant fees for: (i) effectively (indirectly) loaning themselves (their investors') monies; and

(ii) using investor monies to make high-risk loans to start-up companies in exchange for warrants (some of which were paid directly to Saltzstein and Fein or entities owned or controlled by them, in addition to their fees). Upon information and belief, the above fraudulent scheme regarding multiple and excessive fees and wrongfully loaning monies to "affiliates" has been ongoing since, at least, 2006.

**Saltzstein and Fein Enter Into a Sham Transaction to "Combine"**
**the Shelter Fund with the Truk Opp Fund**

45.     Upon information and belief, in or about March 13, 2009, Saltzstein and Fein "combined" the Shelter Fund with another fund they managed, the Truk Opp Fund.[1]

46.     In a statement (dated March 31, 2009) by SS&C Fund Administration Services, LLC ("SS&C"), a fund administrator that provides no opinion on the accuracy or validity of valuations received from the Shelter Fund, it was revealed that:

> As of December 31, 2008, the Fund's auditors, Eisner LLP ("Eisner"), proposed adjustments to the valuations of certain of the Fund's investments to bring the valuations into conformity with generally accepted accounting principles ("GAAP"), specifically Financial Accounting Standards Board Statement No. 157. With regard to the valuations of the Fund's holdings, the investment manager accepted adjustment suggested by Eisner and accordingly restated the value of the Fund at December 31, 2008. With regard to an affiliate of the Fund, Truk Opportunity Fund, LLC ("Truk"), the investment manager and Eisner did not agree to certain adjustments (with respect to securities that were not held by the Fund but were held by Truk), with the result that **Eisner concluded that the financial statements of Truk at December 31, 2008 were not in accordance with GAAP**. The delay in reporting account balances to investors partly has been caused by this ongoing discussion concerning valuations between the auditors and the investment manager. **Had GAAP figures been used for Truk, the values would have been adjusted significantly downwards.**
>
> **Effective March 13, 2009, the Fund and Truk were combined. The values used for such combination were the combined capital account**

---

[1] Truk Opp Fund is technically a different entity then the Truk Fund. However, as stated below, upon information and belief, Truk Opp Fund was either combined with the Truk Fund (without Plaintiff's knowledge) or was treated as one single fund by Saltzstein and Fein.

**values of both funds as of March 13, 2009, including valuations determined by the investment manager for Truk that were found by Eisner not to be in accordance with GAAP.**

The March 31, 2009 statement from SS&C is annexed hereto as <u>Exhibit F</u> (emphasis added).

47.    In addition to the fact that Saltzstein and Fein "combined" the Shelter Fund and the Truk Opp Fund using valuations that were found by Eisner not to be in accordance with GAAP, it also appears that the agreement combining the two funds is a farce. Annexed hereto as <u>Exhibit G</u> is the "Contribution and Transfer Agreement" which purports to set forth the terms of the transaction.

48.    Notably, the document is executed by Michael E. Fein, Principal of Atoll Asset Management, LLC, the Managing Member of Truk Opportunity Fund, LLC, on the one hand, and Michael E. Fein, Principal of Shelter Island GP, LLC, the Managing Member of Shelter Island Opportunity Fund, LLC, on the other hand. <u>Exh. G</u>, pg. 5.

49.    Putting aside the inherent conflict of interest of Fein being the signatory on both sides of the contract, it also appears that there is no definable consideration for the transaction. That is, Fein agreed with himself that the Truk Opp Fund would irrevocably contribute the Securities listed in "Schedule A" to the agreement to the Shelter Fund, and in exchange, the Truk Opp Fund would be issued an "interest" in the Shelter Fund. <u>Exh. G</u>, pg. 1. The contract fails to identify, however, what specific percent interest the Truk Opp Fund would receive and Schedule A to the agreement (which supposedly identifies the specific securities owned by the Truk Opp Fund) merely states, "All securities owned by the Truk Fund as of March 13, 2009, all rights and benefits related thereto, and all rights and benefits otherwise held by the Truk [Opp] Fund." <u>Id</u>. pg. 6 (emphasis added).

50.    In other words, **Fein -- acting on both sides of the equation -- gave the Truk Opp Fund an unidentified interest in the Shelter Fund in exchange for unidentified securities supposedly owned by the Truk Opp Fund as of March 13, 2009**.

51.    Upon information and belief, Fein and Saltstein (as co-managers) entered into a sham transaction to the detriment of the legitimate investors of the Shelter Fund, thus breaching their fiduciary duty as the managing members and investment advisors of the Shelter Fund.

52.    By letter dated July 1, 2009, Eisner informed Fein that he "may have to explain to your investors why your 2008 audited financial statements are taking longer than usual to issue this year, and why the final audited number will differ from preliminary numbers you previously provided." See, July 1, 2009 letter from Eisner to Fein (at RAM) as Exhibit H.

53.    Whereas it was previously disclosed by SS&C that Eisner had disagreed with the **Truk Opp Fund's valuations**, by letter dated July 17, 2009, Fein and Saltzstein (on RAM letterhead) admitted to investors of the **Truk International Fund** that Eisner had disagreed with its prior valuations. See, Exhibit I annexed hereto. Upon information and belief, therefore, and as stated above, Saltzstein and Fein either previously combined the Truk International and Truk Opportunity funds (without informing members of either fund), or treated the two separate entities as one in the same. In any event, this was the first time any of the Plaintiffs learned that the valuations of the Truk International Fund were *also* not in conformity with GAAP.

**Plaintiffs' Redemption Requests are Denied in the Same Year**
**That Saltzstein and Fein permit Several Million Dollars in Redemptions**
**to Other (Undisclosed) Investors**

54.    As of March 31, 2009, the Fratis' capital in the Shelter Fund was $2,014,494. See, Exh. F.

55.    On April 2, 2009, the Fratis requested a complete withdrawal of all funds in their account -- which was their right since the six-month lock-up period expired in July 2008. This was confirmed by email from Mario Frati to Saltzstein and Fein on April 3, 2009 (annexed hereto as Exhibit K).

56.    After sending the April 3, 2009 email, Mario Frati received a telephone call from Fein indicating that he would consider making a special "family accommodation" and thus permit redemption for the April quarter, rather than in June.

57.    Notwithstanding Fein's telephone call with Mario Frati, and without any explanation, Fein responded by email on April 6, 2009, stating, "[w]e confirm receipt of your withdrawal request. Regrettably, we are unable to accommodate an earlier withdrawal and the redemption will be processed in accordance with fund documentation effective 6/30/09."

58.    Upon information and belief, the reason why Saltzstein and Fein refused Plaintiffs' redemption requests is because the investment monies have been loaned to other entities managed and/or controlled by Saltzstein and Fein (or of which they have an interest) -- and such loans have not been repaid.

59.    Saltzstein and Fein claimed that no redemptions could occur until an audit was complete, and sent periodic correspondence to Mario and Stacy Frati to that effect. See, e.g., Exhibit L. Giving Saltzstein and Fein the benefit of the doubt, the Fratis eagerly awaited audited financials -- which never came.

60.     On October 29, 2009, Mario and Stacy Frati received an email from Brendan Schwartz (of RAM), stating that, "[w]e expect to make that initial cash [distribution] payment shortly." See, Exhibit M.

61.     Despite Saltzstein's and Fein's (and other agents of RAM's) representations, and complying with the filing of all paperwork pursuant to RAM's instructions, the Fratis have not received any redemption.

62.     Similarly, BPL followed all applicable instructions and made a redemption request (for its investment in the Truk Fund) in or about April 6, 2009. See, Exhibit N. To date, of the $1.5 Million investment, BPL has received redemption of approximately $150,000.

**Neither Saltzstein, Fein or RAM Comply with the SEC Order**

63.     As stated above, by SEC Order dated June 19, 2009: (i) RAM, Saltzstein and Fein were ordered to cease and desist from committing or causing any violations and any future violation of Section 15(a) of the Exchange Act; (ii) Fein was suspended from association with any broker or dealer for a period of twelve months; (iii) Saltzstein was suspended from association with any broker or dealer for a period of six months; and (iv) Fein and Saltzstein were ordered to pay disgorgement, prejudgment interest and civil penalties in the amount of $538,378 each. See, Exh. A, pg. 5.

64.     Neither Saltzstein, Fein nor RAM ever informed Plaintiffs of the SEC Order. Rather, Mario and Stacy Frati became aware of the SEC Order in late 2009 while performing a Google search of Saltzstein and Fein.

65.     Upon information and belief, Saltzstein and Fein both violated the SEC Order by committing further violations of Section 15(a) of the Exchange Act, by, among other things, receiving commission (in the form of cash and warrants) as unregistered brokers from their

activities (conducted through RAM, an unregistered broker or dealer) regarding PIPE offerings, and other securities offerings and transactions through hedge funds controlled by them (including, but not limited to, the Shelter Fund and Truk Fund).

66.    Upon information and belief, RAM also violated the SEC Order by continuing to act as an unregistered broker or dealer with respect to its involvement in PIPE offerings and other securities offerings and transactions involving the Shelter Fund and Truk Fund.

## AS AND FOR A FIRST CAUSE OF ACTION FOR
## COMMON LAW FRAUD

67.    Plaintiffs repeat and re-allege each of the above paragraphs as if fully set forth herein in their entirety.

68.    Saltzstein and Fein, personally and on behalf of all Defendants, represented to Plaintiffs that Saltzstein's sister was invested in the Shelter Fund and that both Saltzstein and Fein had most of their own net worth invested in the Shelter Fund. Saltzstein and Fein also represented that the lockup period on the investment would be six (6) months and after that time the full investment may be redeemed. Saltzstein and Fein intentionally omitted any reference to the investment being illiquid and incapable of redemption. Saltzstein and Fein intentionally omitted any reference to the fact that they were operating as unregistered brokers through an unregistered broker-dealer, RAM -- and were under investigation by the SEC for such wrongful activities. Saltzstein's and Fein's representations and omissions, upon information and belief, were material and false and intended to wrongfully induce Plaintiffs to invest with Saltzstein and Fein (in the Shelter Fund and the Truk Fund – both of which, upon information and belief, entered into PIPE transactions and other securities offerings and transactions).

69.    Based on Saltzstein's and Fein's fraudulent representations of material fact and material omissions, Saltzstein and Fein induced Plaintiffs to execute subscription documents

without first providing Plaintiffs with underlying investment documents, including but not limited to, private placement memoranda.

70.     Plaintiffs relied on Saltzstein's and Fein's misrepresentations and omissions to their detriment by: (i) signing subscription documents without first having received a private placement memorandum with risk disclosures; (ii) wiring $2 million (in the case of Mario and Stacy Frati) and $1.5 million (in the case of BPL) to Saltzstein and Fein through their unregistered broker/dealer, RAM.

71.     Based on the foregoing, any documents executed by Plaintiffs relating to the Shelter Fund and Truk Fund were the product of fraud.

72.     Upon information and belief, all Defendants received commissions and/or fees as a direct result of Saltzstein's and Fein's material misrepresentations and omissions.

73.     Further, upon information and belief, Defendants engaged in a fraudulent scheme, since 2006, whereby Saltzstein and Fein used the corporate defendants to collect multiple, excessive and exorbitant fees -- often based on net unrealized gains known by Saltzstein and Fein to be based on artificially inflated valuations -- and to also loan investor monies indirectly to themselves, through their "affiliate" entities (of which they also had an interest).

74.     As a direct result of Defendants' common law fraud, Plaintiffs have been injured in an amount to be determined at trial, but believed to be no less than $3,500,000, exclusive of interest and all attorneys' fees and costs associated in prosecuting this action. As Defendants' actions were intentional and designed to deceive the Plaintiffs and the public in general, Plaintiffs respectfully request an additional award of $10,000,000 in punitive damages.

**AS AND FOR A SECOND CAUSE OF ACTION FOR
VIOLATION OF § 10(b) OF THE SECURITIES ACT OF 1934
AND RULE 10b-5 PROMULGATED THEREUNDER**

75.    Plaintiffs repeat and re-allege each of the above paragraphs as if fully set forth

herein in their entirety.

76.    The material misrepresentations and omissions and acts aiding and abetting such

misrepresentations and omissions described above, on which Plaintiffs relied to their detriment,

constitutes fraudulent and deceptive acts and practices by the Defendants, committed knowingly,

intentionally and/or grossly negligently and with a deliberate and/or reckless indifference to

making an accurate, fair, balanced and non-misleading presentation to Plaintiffs, in violation of

§10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated

thereunder.

77.    As a direct result of Defendants' securities fraud, Plaintiffs have been injured in

an amount to be determined at trial, but believed to be no less than $3,500,000, exclusive of

interest and all attorneys' fees and costs associated in prosecuting this action. As Defendants'

actions were intentional and designed to deceive the Plaintiffs and the public in general,

Plaintiffs respectfully request an additional award of $10,000,000 in punitive damages.

**AS AND FOR A THIRD CAUSE OF ACTION FOR
FRAUDULENT MISREPRESENTATION**

78.    Plaintiffs repeat and re-allege each of the above paragraphs as if fully set forth

herein in their entirety.

79.    The material misrepresentations and omissions by the Defendants described

above, which Plaintiffs relied to their detriment, were fraudulent, and made with the intent to

mislead Plaintiffs and induct them into executing subscription documents (and investing in) the

Shelter Fund and the Truk Fund.

80.    Upon information and belief, Defendants' motive to defraud the Plaintiffs was fueled by their intent to induce Plaintiffs' to invest monies into funds controlled by Saltzstein and Fein, upon which Saltzstein and Fein (and all of the Defendants) would then directly take fees and commissions (and indirectly take other monies, securities and warrants as the byproduct of investments made by the funds using the Plaintiffs' monies).

81.    As a direct result of Defendants' securities fraud, Plaintiffs have been injured in an amount to be determined at trial, but believed to be no less than $3,500,000, exclusive of interest and all attorneys' fees and costs associated in prosecuting this action. As Defendants' actions were intentional and designed to deceive the Plaintiffs and the public in general, Plaintiffs respectfully request an additional award of $10,000,000 in punitive damages.

### AS AND FOR A FOURTH CAUSE OF ACTION FOR VIOLATIONS OF RICO UNDER 18 U.S.C. § 1962(b)

82.    Plaintiffs repeat and re-allege each of the above paragraphs as if fully set forth herein in their entirety.

83.    Defendants each constitute an "enterprise" as that term is defined in 18 U.S.C.A. § 1961, engaged in interstate commerce and carrying on activities that affect interstate commerce. Such activities in and affecting interstate commerce include, among other things, the soliciting and taking and redemption of investor monies that have moved in interstate commerce.

84.    Alternatively, all of the Defendants together and/or combinations of two or more of the Defendants constitute enterprises within the meaning of 18 U.S.C. § 1961(4) (hereinafter collectively referred to as the "Enterprises") engaged in interstate commerce and carrying on activities that affect interstate commerce. Such activities in and affecting interstate commerce include, among other things, the soliciting and taking and redemption of investor monies that have moved in interstate commerce.

85.    Prior to 2002, the exact date being unknown by Plaintiffs, Saltzstein and Fein devised a scheme and artifice to deprive investors of their property by acting as unregistered brokers an unregistered broker-dealer, RAM.  Thereafter, but prior to June 2006, in furtherance of the aforementioned scheme, Plaintiffs Saltzstein and Fein devised a scheme and artifice to deprive Mario and Stacy Frati of their property by convincing them to invest in the Shelter Fund (a fund controlled by Saltzstein and Fein), with an investment of $2,000,000, in order to generate multiple and excessive commissions (and other forms of compensation) for themselves and entities manipulated by them, including but not limited to, RAM, Shelter GP and Midway. Thereafter, Defendants furthered their scheme by convincing BPL's client, Mrs. Mirella Siroli, to invest in the Truk Fund (a fund controlled by Saltzstein and Fein), with an investment of $1,500,000, in order to generate multiple and excessive commissions (and other forms of compensation) for themselves and entities manipulated by them, including but not limited to, RAM and Atoll.

86.    Upon information and belief, Saltzstein and Fein, intentionally manipulated each of the Defendants so as to have complete and total, and unaccountable, control over the invested funds -- and to be able to collect multiple and excessive fees and commissions through each of Defendants.  Because Saltzstein and Fein acted as unregistered brokers (and RAM acted as an unregistered broker-dealer), their activities were not monitored by a regulatory organization.  In addition, Saltzstein and Fein used Plaintiffs' monies to give themselves (or other entities of which they owned an interest) loans which have not been repaid, and are not intended to be repaid.  Further, Saltzstein and Fein intentionally and wrongfully artificially inflated the valuations of the Shelter and Truk Funds for the purpose of generating higher commissions and fees for themselves and the other Defendants.

87.    Defendants, for the purpose of executing the aforementioned scheme and artifice to defraud Plaintiffs of their property, used and caused to be used the mails of the United States and the internet. Such use of the United States mails and internet for purposes of effectuating the scheme to deprive Plaintiffs of their property included, without limitation, the following:

    a.    The mailing and/or e-mailing of materially misleading solicitations to invest in the Shelter and Truk Funds from Defendants to the Plaintiffs; and

    b.    The mailing and/or e-mailing of materially misleading financial and member capital account statements of the Shelter Fund and Truk Fund from Defendants to the Plaintiffs; and

    c.    The mailing and/or emailing of other documents from Defendants to the Plaintiff.

88.    Defendants, for the purposes of executing the scheme to defraud Plaintiffs of their property, transmitted and caused to be transmitted communications by means of wire/internet or telephone in interstate commerce. Such interstate communications by wire/internet or telephone included, without limitation, telephone calls between Saltzstein and Fein (on behalf of all Defendants) and the Plaintiffs.

89.    The use of the mails and internet for the purposes of effectuating the above-mentioned scheme to defraud Plaintiffs, which occurred on more than one occasion in the past ten years, or the transmission of interstate communications by wire or telephone to effectuate the scheme, which occurred on more than one occasion in the past ten years, constitutes, for the purposes of this action, a pattern of racketeering activity in violation of 18 U.S.C.A. § 1962, for which treble damages, costs of suit and attorneys' fees may be sought under 18 U.S.C.A. § 1964(c).

90.    Each of the aforesaid violations by the Defendants of the mail fraud and wire fraud statutes, 19 U.S.C. §§ 1341 and 1343, constitutes an instance of racketeering activity as defined in 18 U.S.C. § 1961(1) and a predicate act for purposes of 18 U.S.C. § 1962. Upon information and belief, Defendants have repeatedly and continuously made material false representations and omissions of fact regarding the solicitations and redemptions of investments in said funds, the excessive and multiple fees to be (and actually) collected, and the loaning of investor monies indirectly to themselves (through "affiliates") since 2006.

91.    The multiple acts of racketeering activity committed by Defendants were interrelated, part of a common and continuous pattern of fraudulent acts, and perpetrated for the same or similar purposes, thus constituting a pattern of racketeering activity as defined in 18 U.S.C. § 1961(5).

92.    Each of the Defendants has willfully, knowingly and intentionally participated in this scheme to defraud the Plaintiffs.

93.    Upon information and belief, Defendants have received income derived, directly and indirectly, from the foregoing pattern of racketeering activity and have used, invested, directly or indirectly, all or part of that income in the establishment of the above described enterprise or enterprises which are engaged in and/or the activities of which affect interstate and foreign commerce, in violation of 18 U.S.C. § 1962(a).

94.    As a direct and proximate result of Defendants' activities in violation of RICO, Plaintiffs have been injured in an amount to be determined at trial, but believed to be no less than $10,500,000, exclusive of interest and all attorneys' fees and costs associated in prosecuting this action. As Defendants' actions were intentional and designed to deceive the Plaintiffs and the

public in general, Plaintiffs respectfully request an additional award of $10,000,000 in punitive damages.

## AS AND FOR A FIFTH CAUSE OF ACTION FOR
## VIOLATIONS OF RICO UNDER 18 U.S.C. § 1962(c)

95.    Plaintiffs repeat and re-allege each of the above paragraphs as if fully set forth herein in their entirety.

96.    Defendants each conducted or participated, directly or indirectly, in the conduct of their affairs and the enterprises' affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c), directly and proximately resulting in Plaintiffs' injuries by virtue of loss of property.

97.    The use of the mails and internet for the purposes of effectuating the above-mentioned scheme to defraud Plaintiffs, which occurred on more than one occasion in the past ten years, or the transmission of interstate communications by wire or telephone to effectuate the scheme, which occurred on more than one occasion in the past ten years, constitutes, for the purposes of this action, a pattern of racketeering activity in violation of 18 U.S.C.A. § 1962, for which treble damages, costs of suit and attorneys' fees may be sought under 18 U.S.C.A. § 1964(c).

98.    As a direct and proximate result of Defendants' activities in violation of RICO, Plaintiffs have been injured in an amount to be determined at trial, but believed to be no less than $10,500,000, exclusive of interest and all attorneys' fees and costs associated in prosecuting this action. As Defendants' actions were intentional and designed to deceive the Plaintiffs and the public in general, Plaintiffs respectfully request an additional award of $10,000,000 in punitive damages.

## AS AND FOR A SIXTH CAUSE OF ACTION FOR
## VIOLATIONS OF RICO UNDER 18 U.S.C. § 1962(d)

99.     Plaintiffs repeat and re-allege each of the above paragraphs as if fully set forth herein in their entirety.

100.     Defendants each intentionally and willfully conspired to violate 18 U.S.C. §§ 1962(b) and (c) in violation of 18 U.S.C. §§ 1962(d).

101.     The use of the mails and internet for the purposes of effectuating the above-mentioned scheme to defraud Plaintiffs, which occurred on more than one occasion in the past ten years, or the transmission of interstate communications by wire or telephone to effectuate the scheme, which occurred on more than one occasion in the past ten years, constitutes, for the purposes of this action, a pattern of racketeering activity in violation of 18 U.S.C.A. § 1962, for which treble damages, costs of suit and attorneys' fees may be sought under 18 U.S.C.A. § 1964(c).

102.     As a direct and proximate result of Defendants' activities in violation of RICO, Plaintiffs have been injured in an amount to be determined at trial, but believed to be no less than $10,500,000, exclusive of interest and all attorneys' fees and costs associated in prosecuting this action. As Defendants' actions were intentional and designed to deceive the Plaintiffs and the public in general, Plaintiffs respectfully request an additional award of $10,000,000 in punitive damages.

## AS AND FOR A SEVENTH CAUSE OF ACTION FOR
## BREACH OF FIDUCIARY DUTY

103.     Plaintiffs repeat and re-allege each of the above paragraphs as if fully set forth herein in their entirety.

104.    Saltzstein and Fein, as managers of the Shelter Fund and the Truk Fund, owed

Plaintiffs (as members of the Shelter Fund and Truk Fund) a fiduciary duty. As such, Saltzstein

and Fein were obligated to perform their duties in the best interest of the respective fund.

105.    Upon information and belief, Saltzstein and Fein breached their fiduciary duty by,

among other things: (i) intentionally setting up the funds in such a way so as to generate multiple

commissions and fees; (ii) knowingly and intentionally taking commissions and fees based on

artificially inflated unrealized income; (iii) immediately redeeming any monies "reallocated" to

themselves in their capital accounts; (iv) "combining" the Shelter Fund and the Truk Opp Fund

without any consideration; (v) failing to provide audited documents and information relating to

the funds (and the investments therein) so that Plaintiffs can make informed decisions regarding

redemption; and (vi) giving preferences for redemption to themselves and/or certain other

undisclosed investors.

106.    As a direct result of Defendants' breach of fiduciary duty, Plaintiffs have been

injured in an amount to be determined at trial, but believed to be no less than $3,500,000,

exclusive of interest and all attorneys' fees and costs associated in prosecuting this action. As

Defendants' actions were intentional and designed to deceive the Plaintiffs and the public in

general, Plaintiffs respectfully request an additional award of $10,000,000 in punitive damages.

## AS AND FOR AN EIGHTH CAUSE OF ACTION FOR DECLARATORY JUDGMENT

107.    Plaintiffs repeat and re-allege each of the above paragraphs as if fully set forth

herein in their entirety.

108.    A dispute exists between the parties as to whether any of the Defendants may use

investor monies (by way of a purported indemnification clause) to defend against this litigation

(including any award or judgment rendered herein), and this dispute is ripe for adjudication.

109.    As a result of the parties' dispute, Plaintiffs respectfully request for the Court to declare the rights of the parties.

## AS AND FOR A NINTH CAUSE OF ACTION FOR
## RESCISSION

110.    Plaintiffs repeat and re-allege each of the above paragraphs as if fully set forth herein in their entirety.

111.    Saltzstein and Fein procured Plaintiffs' signatures on the relevant subscription documents by means of fraud, upon which Plaintiffs reasonably relied to their detriment.

112.    Had Saltzstein and/or Fein disclosed to Plaintiffs that: (i) Saltzstein's sister was not an investor in the Shelter Fund; (ii) Saltzstein and Fein did not have most of their own net worth invested in the Shelter Fund; (iii) Saltzstein and Fein were conducting business as unregistered brokers; (iv) RAM was conducting business as an unregistered broker-dealer; (v) RAM, Saltzstein and Fein were being investigated by the SEC for violating SEC rules and regulations; (vi) Plaintiffs would not immediately be able to redeem their entire investment after the initial six-month period agreed upon; (vii) the funds were set up in such a way so that Saltzstein and Fein were not accountable to anyone or any regulatory entity and can (and would) collect multiple and excessive commissions and fees (both directly and indirectly); (viii) Plaintiffs would not be permitted to inspect audited financial statements; (ix) Saltzstein and Fein would be loaning to undisclosed "affiliated" entities, millions of dollars of investor monies, with no accountability; and (xii) Saltzstein and Fein would "combine" funds managed by them (such as the Shelter and Truk Opp Funds) without the exchange of consideration in good faith -- Plaintiffs would never have invested anything through Saltzstein or Fein or any of the entities they managed or controlled.

113.    As a result of Saltzstein's and Fein's fraudulent representations and material omissions, Plaintiffs request rescission of the documents signed by them for their investments in the Shelter Fund and the Truk Fund.

### AS AND FOR A TENTH CAUSE OF ACTION FOR
### UNJUST ENRICHMENT

114.    Plaintiffs repeat and re-allege each of the above paragraphs as if fully set forth herein in their entirety.

115.    As a result of Saltzstein's and Fein's fraudulent representations and material omissions as stated above, all Defendants have received commissions and fees (and other compensation in the form of cash and warrants) that they would otherwise not have received.

116.    As a direct result of Defendants' wrongful conduct as stated above, Plaintiffs have been injured in an amount to be determined at trial, but believed to be no less than $3,500,000, exclusive of interest and all attorneys' fees and costs associated in prosecuting this action. As Defendants' actions were intentional and designed to deceive the Plaintiffs and the public in general, Plaintiffs respectfully request an additional award of $10,000,000 in punitive damages.

### AS AND FOR AN ELEVENTH CAUSE OF ACTION FOR
### AN ACCOUNTING

117.    Plaintiffs repeat and re-allege each of the above paragraphs as if fully set forth herein in their entirety.

118.    Despite Defendants' promises and assurances that it would account for the Shelter and Truk Funds' assets, liabilities, investments, loans, expenses -- with underlying documentation -- Defendants have continually delayed the production of such documents and ultimately, have failed to produce such documents.

119.    In addition, pursuant to the allegations of wrongdoing state above, it is vital that Defendants account for all capital contributions and distributions.

120.    As a result of Plaintiffs' status as members of the Shelter and Truk Funds, Plaintiffs' respectfully request a full accounting as stated herein.

## AS AND FOR A TWELFTH CAUSE OF ACTION TO
## PIERCE THE CORPORATE VEIL

121.    Plaintiffs repeat and re-allege each of the above paragraphs as if fully set forth herein in their entirety.

122.    Upon information and belief, at all relevant times Saltzstein and Fein complete domination and control over all corporate defendants, such that each such defendant had no will of its own, and such domination and control was used to defraud the Plaintiffs.

123.    Upon information and belief, Saltzstein and Fein comingled monies belonging to investors in the Shelter Fund, the Truk Fund and the Truk Opp Fund such that all entities together with Saltzstein and Fein acted as alter-egos of each other, all with the intent to defraud investors, such as Plaintiffs.

124.    To prevent injustice, Saltzstein and Fein, who upon information and belief took fees and/or compensation from each of the corporate defendants, should be held responsible for the debts of all corporate defendants.

125.    As a direct result of Defendants' wrongful conduct as stated above, Plaintiffs have been injured in an amount to be determined at trial, but believed to be no less than $3,500,000, exclusive of interest and all attorneys' fees and costs associated in prosecuting this action. As Defendants' actions were intentional and designed to deceive the Plaintiffs and the public in general, Plaintiffs respectfully request an additional award of $10,000,000 in punitive damages.

**WHEREFORE**, Plaintiffs respectfully request the relief sought herein, together with any other relief that the Court deems just and proper.

DATED:    New York, New York
          April 7, 2010

                                        THE ROTH LAW FIRM, PLLC

                                        By
                                              Richard A. Roth
                                              Jordan M. Kam
                                        295 Madison Avenue, 22nd Fl.
                                        New York, New York 10017
                                        Tel: 212-542-8882
                                        Fax: 212-542-8883
                                        *Attorneys for Plaintiffs*